UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
-----------------------------------------------------x
UMB BANK, N.A., solely in its capacity as      :
Administrative Agent,                          :        Civil Action No.: 1:22-cv-4747
                                               :
                  Plaintiff,                   :        COMPLAINT
                                               :
          -against-                            :
                                               :
QUORUM HEALTH CORPORATION,                     :
                                               :
                  Defendant.                   :
                                               :
-----------------------------------------------------x
```

Plaintiff, UMB Bank, N.A. (the "Agent"), acting solely in its capacity as Administrative

Agent, upon knowledge of its own conduct and otherwise upon information and belief, alleges

for its complaint against Quorum Health Corporation ("Quorum," or the "Borrower") as follows:

## INTRODUCTION

1.      This action seeks a declaration that defendant Quorum, the borrower under a $732

million secured credit facility executed in July 2020 (the "Credit Agreement"[1]), wrongly

calculated and falsely represented its financial leverage in disclosures to its secured lenders. The

improper calculations were made as part of an aggressive scheme, orchestrated by the

Borrower's hedge-fund equity owners, to lower the Borrower's interest rate on the loans, deprive

the lenders of key contractual protections under the Credit Agreement as the Borrower's

financial condition worsened, and unlawfully forestall an exercise of remedies by the lenders that

would threaten the owners' equity investment and control of Quorum. Plaintiff, acting as agent

for the lenders, asks the Court to declare that the Borrower's leverage calculations and the

---

[1] A true and correct copy of the Credit Agreement is attached as Exhibit A.

methodology used to arrive at them are inconsistent with the Credit Agreement and that the Borrower, by virtue of its improper calculations and resulting underpayments of interest, has defaulted under the Credit Agreement.

2.     Quorum is a healthcare company that operates hospitals and outpatient facilities throughout the United States. In early 2020, just before the onset of the COVID-19 pandemic, Quorum encountered financial distress because it was over-leveraged and struggled to service its debt, including nearly $900 million of secured loans and $400 million of unsecured notes. The lenders, with liens on substantially all the company's assets, effectively had priority over other stakeholders. Given the company's deteriorating financial condition, a default on the loans was imminent, at which point the secured lenders could have exercised remedies and foreclosed on their collateral—potentially leaving junior creditors with little or no recovery at all. But the lenders, keen to avoid a liquidation of a rural healthcare provider, especially at the start of a global pandemic, searched for more constructive solutions.

3.     The lenders engaged in extensive negotiations with Quorum and the noteholders and eventually agreed on a value-maximizing restructuring under which some of the noteholders would infuse $200 million of new money and take equity ownership and control of Quorum. The lenders, for their part, agreed to continue lending to the reorganized company under a new secured facility—an essential element of the restructuring—but only if they received the benefit of a suite of restrictive covenants and other provisions that would protect them (and even allow them to exercise remedies and take control of Quorum) if the company again became financially distressed.

4.     The lenders thus bargained for numerous provisions tied to the Borrower's "Secured Net Leverage Ratio," a figure that compares the amount of the Borrower's secured

2

indebtedness to its "Consolidated EBITDA"—a measure of cash earnings that must be calculated according to a highly specific and heavily negotiated methodology. The higher the leverage ratio, the more Quorum would have to pay in interest. A higher leverage ratio also would subject Quorum to stricter restrictions on the use of its property, including limitations on its ability to pay dividends or to use proceeds of asset sales for anything other than prepaying the loans. The lenders further bargained for a "maintenance covenant," requiring that the leverage ratio be maintained below a contractually specified ceiling, which would lower over time, throughout the term of the loans. If Quorum could not keep its leverage ratio below the maximum, the new equity holders would be allowed to infuse more capital to correct the problem; but if they did not do so, Quorum would default on the loans.

5.      The unsecured noteholders, who were to become the new equity owners of Quorum, agreed to these provisions because they expected that the business would perform well, such that Quorum successfully could service its debt and comply with all its obligations to the lenders. Yet they also knew that if the business deteriorated, the secured lenders' protections would tighten, and a failure by Quorum to abide by the restrictions and covenants would result in the lenders being entitled, once again, to exercise remedies and foreclose on their collateral. Such action would divest the new equity holders of their ownership and control and potentially result in a loss of the $200 million new-money investment.

6.      After months of extensive negotiations, the parties agreed on the essential terms of a plan of reorganization for Quorum, including the new Credit Agreement. The company emerged from bankruptcy in the summer of 2020 subject to the Credit Agreement and with a group of noteholders as its new controlling shareholders.

7. The new owners' expectations did not pan out. Quorum's financial statements for year-end 2021 disclosed disastrous results: a net loss of more than $116 million for the year, a precipitous drop from the nearly $239 million in net income the company reported for year-end 2020. Similarly, a key measure of earnings on which management relies to assess the business— "Adjusted EBITDA"—dropped from nearly $163 million for 2020 to just $97.5 million for 2021. This troubling downturn meant that the lenders' protections under the Credit Agreement were becoming most relevant—and the equity owners' new-money investment was at risk of being wiped out. Instead of accepting the consequences of the Credit Agreement terms to which they had agreed, however, the equity owners caused Quorum to manipulate the calculation of its leverage ratio in a deliberate and unlawful effort to loosen the restrictions in the Credit Agreement, lower the applicable interest rate, forestall the need for the owners to infuse more capital, and avoid the consequences of a default.

8. On March 30, 2022, Quorum reported Consolidated EBITDA (the denominator of the leverage ratio and a calculation different than Adjusted EBITDA) for the 12 months ended December 31, 2021, of approximately $160 million. But that was not an accurate reflection of the company's financial health. Of that amount, more than $50 million constituted one-off grants from the government related to COVID-19, not revenue from the actual operations of the business. And $59 million represented expenses purportedly "directly" related to COVID-19 that Quorum "added back" to its net income when determining Consolidated EBITDA. Quorum announced to the lenders that this $59 million figure was calculated based on a radical change of methodology that it adopted for the very first time in March 2022, deviating from the terms of the Credit Agreement and past practice.

9.      Quorum, in other words, inflated its earnings for purposes of calculating its leverage ratio by *more than three times*, from just over $50 million to $160 million, by making COVID-19 adjustments and including stimulus funds. This huge change, in turn, resulted in a reported leverage ratio that was highly favorable for Quorum and prejudicial to the lenders: Quorum reported a ratio entitling it to pay the lowest possible interest rate, permitting it to reinvest the proceeds of asset sales (rather than using them to prepay the loans), and placing it well below the maintenance covenant ceiling.

10.     Quorum's calculation was materially false and inconsistent with the Credit Agreement for several reasons. Quorum's inclusion of more than $50 million of government stimulus funds in Consolidated EBITDA violated terms of the Credit Agreement expressly providing that Quorum must exclude "extraordinary" or "non-recurring" gains. And while the Credit Agreement allows Quorum to "add back" expenses directly caused by COVID-19 that reduced the company's net income, Quorum added back such expenses even when they were reimbursed, including by government stimulus funds. Thus, in an egregious display of double-counting, Quorum increased the Consolidated EBITDA reported to the lenders by adding back its COVID-19 expenses *and* including the money it received from the government or other sources to pay those expenses. Transactions that economically were a "wash" were counted as a pure gain. Additionally, the Credit Agreement permits Quorum to add back only expenses "directly" caused by COVID-19—such as the costs of purchasing personal protective equipment for its employees—but under its newly devised methodology, Quorum added back many expenses that were, at best, indirectly related to COVID-19 and, at worst, wholly unrelated to COVID-19. These included, for example, higher contract labor rates for healthcare workers resulting from general labor shortages and inflation in the economy.

11.     Quorum's improper calculation of its leverage ratio already has harmed the lenders. On April 7, 2022, Quorum made an interest payment in an amount that was based, in part, on its March 30 leverage ratio calculation and newfangled methodology. As a result, the payment was lower than what would have been paid had Quorum's calculation of its leverage ratio complied with the Credit Agreement. Interest then accrued on the loans at too low a rate for the ensuing period.

12.     On May 23, 2022, Quorum perpetuated the problem. It delivered its financial results for the first quarter of 2022, including a compliance certificate with a new calculation of the leverage ratio, which purported to establish the rate at which interest would accrue for the following period. These latest disclosures revealed that the company's financial condition had deteriorated even further. "Adjusted EBITDA" for the first three months of 2022 was a mere $3 million, compared to more than $25 million for the last three months of 2021. And management expressed in its financial statements substantial doubt as to Quorum's ability to continue as a going concern and meet its obligations as they become due within the next year. Quorum reported a higher leverage ratio than it had in its March 30 compliance certificate; but, on information and belief, it continued to employ its improper methodology for the calculation, materially understating its leverage ratio and the resulting interest rate. The May 23 disclosures, meanwhile, brought into stark relief the extent to which the company's improper reliance on government stimulus funds to calculate its leverage ratio was masking its true performance: at the same time the company reported a much higher leverage ratio, it also reported that the amount of stimulus money it received from the government had dropped off materially.

13.     Substantial additional harm will befall the lenders if Quorum remains out of compliance with the terms of the Credit Agreement. Quorum will continue to accrue interest at

too low a rate and will underpay the lenders again on future payment dates. Moreover, Quorum has announced to the lenders that it is in advanced stages of consummating substantial sales of assets, which could yield tens of millions of dollars in proceeds. Any such proceeds must be used to prepay the loans if Quorum's leverage ratio is above agreed-upon levels.

14.     Beyond this, the leverage ceiling in the maintenance covenant is scheduled to step down materially each quarter between now and March 30, 2023. Quorum's improper calculation methodology misstates the true leverage condition of the company, thereby artificially giving the business more leeway to decline before the equity owners must infuse new capital or face an exercise of remedies by the lenders and potentially lose their existing investment. There is a high likelihood that Quorum already is in violation of its maintenance covenant, or at least will be soon. In its May 23 disclosures, Quorum claimed that it remained in compliance for the first quarter of 2022. But, on information and belief, that claim was based on an understated leverage ratio derived using the company's improper calculation methodology; and if Quorum's incorrect inclusion of government stimulus funds in its COVID-19 addbacks were reversed, it would be in breach of the maintenance covenant today. Still, even employing Quorum's improper methodology, the company announced that in light of its declining condition and the fact that the maintenance covenant ceiling is scheduled to step down over the course of the year, there is "substantial doubt" that Quorum will remain in compliance and continue as a going concern for the remainder of 2022.

15.     The circumstances of Quorum's leverage calculations and change in methodology reek of bad faith. They demonstrate that the calculations were designed to paint an overly rosy and unrealistic picture of the Borrower's financial condition, all in an effort to protect the equity owners' $200 million investment and to prejudice the lenders at precisely the moment when their

protections under the Credit Agreement are most important—that is, when Quorum's financial condition is deteriorating. Unless this Court intervenes now to declare Quorum's leverage calculations and the newly adopted methodology inconsistent with the Credit Agreement, the lenders will continue to suffer prejudice while the equity owners reap a windfall and improperly deny lenders the benefit of their bargain.

## PARTIES

16.   Plaintiff UMB Bank, N.A. is a national bank with its headquarters and principal offices in Kansas City, Missouri. It brings this action solely in its capacity as Administrative Agent under the Credit Agreement, in accordance with a direction of lenders holding more than 50% of the aggregate principal amount of loans outstanding.

17.   Plaintiff became Administrative and Collateral Agent on June 6, 2022, replacing the original Administrative and Collateral Agent, Jefferies Finance LLC. Under section 9.20(e) of the Credit Agreement, "all powers, rights, and remedies under the Loan Documents may be exercised solely by the Agents on behalf of the Secured Parties in accordance with the terms thereof."

18.   Quorum is a corporation formed under the laws of Delaware with its principal place of business in Tennessee.

## JURISDICTION AND VENUE

19.   This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interests and costs, and the action is between citizens of different states.

20.   This Court has personal jurisdiction over Quorum because, under the Credit Agreement, Quorum irrevocably and unconditionally submitted itself to the jurisdiction of any New York State court or federal court sitting in New York City in any action or proceeding

arising out of or relating to the Credit Agreement, and further irrevocably and unconditionally agreed that all claims in respect of any such action or proceeding may be heard and determined in such courts.

21.     Venue in this district is proper. In the Credit Agreement, Quorum irrevocably and unconditionally agreed to the laying of venue of any suit, action, or proceeding arising out of or relating to the Credit Agreement in any state or federal court in New York.

## **FACTUAL BACKGROUND**

**I.    QUORUM'S BANKRUPTCY AND THE NEGOTIATION OF THE CREDIT AGREEMENT**

22.     Quorum (along with the broader enterprise of which it is a part) provides hospital and outpatient healthcare services in rural and mid-sized markets across 13 states. It runs 21 hospitals that provide a variety of services, including general and acute care, emergency room, general and specialty surgery, critical care, internal medicine, diagnostic services, obstetrics, psychiatric, and rehabilitation services.

23.     By late 2019, before the onset of the COVID-19 pandemic in the United States, Quorum was in financial distress. It had more than a billion dollars in debt, including $99 million in loans under an "ABL Credit Facility" secured by substantially all assets of the company, $785.3 million in loans under "First-Lien Credit Facilities" also secured by substantially all assets of the company, and $400 million in unsecured "Senior Notes." And it was facing a shortfall of liquidity to service these obligations.

24.     Given the company's inability to pay its debts, a default on the loans was imminent, at which point the secured lenders would have been entitled to exercise remedies and foreclose on the entirety of Quorum's assets, essentially liquidating the company and potentially leaving little or no value for junior creditors like the holders of the Senior Notes. As the COVID-

19 pandemic took hold in the United States, however, the company's healthcare services became more important than ever, especially in the rural communities they served. The secured lenders therefore were eager to reach a solution to Quorum's problems that would not involve a foreclosure or liquidation, and that instead would allow the company to continue as a going concern. A group of secured lenders under the First Lien Credit Facilities engaged in discussions with Quorum and other key creditor constituencies, including a group of the holders of Senior Notes, concerning a consensual and value-maximizing workout.

25.     After extensive negotiations, these parties agreed on the framework of a restructuring. The noteholder group agreed to invest $200 million in new funds, in return for which the noteholders would receive the equity of the reorganized company, and the group of lenders under the First Lien Credit Facilities agreed to continue acting as lenders to the reorganized business under a new, smaller, credit facility providing for $732 million in secured loans—an essential element of the restructuring. In exchange for these concessions, the lenders required Quorum to be bound by a strict set of guardrails to protect the lenders' rights if Quorum failed to perform as hoped. Among other things, if Quorum remained at higher leverage levels, the lenders would be entitled to receive higher interest payments, all asset sale proceeds would have to be used to prepay the loans (without Quorum being allowed to retain and reinvest those funds), and Quorum would be prohibited from paying dividends or incurring new debt. Additionally, the lenders obtained the protection of a financial maintenance covenant stipulating that Quorum's leverage could not exceed a specified ceiling (which would decrease over time). If Quorum failed to keep its leverage low enough, the new equity owners would have to infuse more capital to bring the leverage down, or else trigger a default by the Borrower that would permit the lenders to exercise remedies.

26.     Thus, the unsecured noteholders—who were to become the new equity owners—would bear the primary economic consequences of Quorum's inability to comply with these restrictions. A default by the Borrower and an exercise of remedies by the lenders potentially would wipe out the $200 million new-money investment and leave the new equity owners with a massive loss. But the new equity owners agreed to the conditions the lenders required because they believed that Quorum's performance would improve over the long term, such that the company would be able to service its secured debt and remain financially healthy. The new equity owners, in other words, expected to reap the benefits of any profit generated by Quorum once its operations improved.

27.     On April 7, 2020, Quorum and its affiliates filed voluntary chapter 11 petitions in the United States Bankruptcy Court for the District of Delaware, seeking approval of a prepackaged plan of reorganization that reflected the terms of this arrangement. The plan provided that, upon emergence from bankruptcy, the Borrower would enter into the new Credit Agreement. The plan was confirmed in June 2020, and the Credit Agreement was executed as of July 7, 2020, when Quorum emerged from bankruptcy.

## II.     THE CREDIT AGREEMENT

28.     The Credit Agreement provides for loans to be made to Quorum in an aggregate principal amount of just over $732 million. The outstanding loans made to Quorum are called "Eurodollar Term Loans" under the Credit Agreement, which refers to the fact that they accrue interest at a base rate pegged to LIBOR (the London Interbank Offered Rate), plus a spread. In some circumstances, including when LIBOR cannot be determined, the loans accrue interest at a rate that depends on a different base, called the Alternative Base Rate, or "ABR," plus a spread; for any period in which this is the case, the loans are called "ABR Term Loans." The outstanding principal balance on the loans as of March 31, 2022, is approximately $669 million.

29.     The term of the loans began on July 7, 2020, and ends on April 29, 2025, at which point all outstanding principal must be repaid. Meanwhile, installments of principal are required to be paid quarterly and interest is due at the end of each interest period (currently set at three-month intervals). The most recent interest payment date on the loans was April 7, 2022.

30.     Section 2.04 of the Credit Agreement provides that the Borrower "unconditionally promises to pay" the principal amount of each loan to the Agent, for the account of each lender. Section 2.19, in turn, requires the Borrower to make each payment of interest and principal, when due, without setoff, defense, or counterclaim.

## A.     Provisions based on "Consolidated EBITDA" and leverage ratios

31.     The Credit Agreement contains several provisions that protect and strengthen the lenders' rights if Quorum's financial performance declines. These provisions rely on the company's "Secured Net Leverage Ratio." The numerator of this ratio is determined by the amount of secured debt owed by Quorum. The denominator is Quorum's "Consolidated EBITDA," a heavily negotiated defined term in the Credit Agreement that was designed to provide a normalized picture of the company's cash earnings in a given period. The lower the company's Consolidated EBITDA, the higher its leverage ratio will be. A higher leverage ratio, in turn, has several consequences for the Borrower.

### 1.     Interest rate

32.     The Secured Net Leverage Ratio determines the rate of interest the Borrower must pay on the loans. Because Quorum needed time to reorganize its operations and to improve its performance after the bankruptcy, the then-noteholders (now equity holders) sought and obtained a one-year postponement—a "covenant holiday"—of the time when leverage would begin to affect interest rates and default rights. But beginning on July 1, 2021, and for all subsequent

periods during the term of the loans, the rate of interest increases with the Secured Net Leverage Ratio. This reflected an understanding that the more leveraged the Borrower becomes, the more risk the lenders will face.

33.     Specifically, the total interest rate is the sum of a base rate (determined by reference to an interest-rate benchmark) and a spread called the "Applicable Percentage." The definition of "Applicable Percentage" includes a grid specifying eight different rates, each corresponding to a level of Secured Net Leverage Ratio, as provided in the following grid in the Credit Agreement:

| Secured Net Leverage Ratio | Eurodollar Spread – Term Loans | ABR Spread – Term Loans |
|---|---|---|
| **Category 1**<br>≤ 4.25 to 1.00 | 6.50% | 5.50% |
| **Category 2**<br>> 4.25 to 1.00 and ≤ 4.50 to 1.00 | 6.75% | 5.75% |
| **Category 3**<br>> 4.50 to 1.00 and ≤ 4.75 to 1.00 | 7.00% | 6.00% |
| **Category 4**<br>> 4.75 to 1.00 and ≤ 5.00 to 1.00 | 7.25% | 6.25% |
| **Category 5**<br>> 5.00 to 1.00 and ≤ 5.25 to 1.00 | 7.50% | 6.50% |
| **Category 6**<br>> 5.25 to 1.00 and ≤ 5.50 to 1.00 | 7.75% | 6.75% |
| **Category 7**<br>> 5.50 to 1.00 and ≤ 5.75 to 1.00 | 8.00% | 7.00% |
| **Category 8**<br>> 5.75 to 1.00 | 8.25% | 7.25% |

### 2.     Maintenance covenant

34.     Section 6.13 of the Credit Agreement imposes a cap on the Secured Net Leverage Ratio the Borrower is permitted to have, beginning in the second half of 2021 and continuing through the remainder of the term of the loans. When the cap first became effective after the expiration of the one-year covenant holiday, the Borrower was not permitted to exceed a Secured

Net Leverage Ratio of 6.50. Thereafter, the maximum permitted under the Credit Agreement steps down as follows:

| Period | Ratio |
|--------|-------|
| July 1, 2021 through December 31, 2021 | 6.50 to 1.00 |
| January 1, 2022 through March 30, 2022 | 6.25 to 1.00 |
| April 1, 2022 through June 30, 2022 | 6.00 to 1.00 |
| July 1, 2022 through September 30, 2022 | 5.75 to 1.00 |
| October 1, 2022 through December 31, 2022 | 5.50 to 1.00 |
| January 1, 2023 through March 30, 2023 | 5.25 to 1.00 |
| Thereafter | 5.00 to 1.00 |

35.     Thus, in early periods of the loans, the lenders agreed that the Borrower could have relatively high leverage. This reflected an understanding that the company was emerging from bankruptcy under new ownership amid an unprecedented global pandemic that was newly emerging and creating enormous uncertainty. In other words, the lenders agreed that Quorum could have a grace period to improve its operations and stabilize; but over time, as the company regained its footing and the pandemic was expected to fade away, the Borrower needed to improve its leverage position.

36.     A failure by the Borrower to maintain a Secured Net Leverage Ratio below the maximum triggers an "equity cure" right of the Borrower's parent company to make a direct equity investment into the Borrower that would, for purposes of the Credit Agreement, serve to increase Consolidated EBITDA for the relevant period and bring down the Borrower's leverage. Otherwise, the Borrower's inability to keep its Secured Net Leverage Ratio below the maximum

would result in a default and allow the lenders, among other things, to exercise their remedies. That is, the equity owners would have to come out of pocket to rescue the Borrower if they wanted to maintain control of the company and protect their equity investment.

### 3.   Restrictions on the use of property and incurrence of indebtedness

37.   The Credit Agreement contains provisions that restrict the Borrower's use of its cash and other property depending on its leverage. The Borrower is required to use proceeds of asset sales to prepay the loans if its Secured Net Leverage Ratio is over 4.75. The Borrower similarly is required to use a portion of its excess cash flows to prepay the loans unless the Secured Net Leverage is less than 4.00. The percentage of excess cash flows that must be used for prepayment increases as the Secured Net Leverage Ratio increases.

38.   The Credit Agreement allows the Borrower to incur additional indebtedness based on Consolidated EBITDA and the Secured Net Leverage Ratio. Quorum is permitted to increase the size of the loan facility by up to 25% of Consolidated EBITDA, plus additional amounts, if the Secured Net Leverage Ratio does not exceed 4.50.

39.   Finally, the Secured Net Leverage Ratio determines the Borrower's ability to move cash and other assets into entities outside the lenders' credit group. Once the Secured Net Leverage Ratio is above 4.00, Quorum is restricted in the amount it can invest in assets that are neither collateral for the lenders nor subsidiaries that guarantee the loans. The Secured Net Leverage Ratio also determines whether, and to what extent, the Borrower can pay dividends or make other distributions to equity holders.

### B.   Calculation of the Secured Net Leverage Ratio

40.   Because of the importance of the Secured Net Leverage Ratio to so many of the lenders' rights and protections under the Credit Agreement, the method by which it must be calculated was heavily negotiated and clearly defined. Calculating Consolidated EBITDA (the

denominator of the ratio and the subject of dispute in this action) begins with determining the Borrower's "Consolidated Net Income," which is defined, in relevant part, to be the "net income or loss" of the Borrower "excluding extraordinary gains and losses." The Borrower then must adjust Consolidated Net Income, using an agreed-upon set of additions and subtractions, to arrive at "Consolidated EBITDA."

41.     The Borrower is required to *subtract* from Consolidated Net Income any "non-recurring gains." This is necessary to ensure that Consolidated EBITDA provides a normalized picture of the company's operational performance that can be used to make comparisons across time periods, without distortions resulting from unusual or short-lived effects. The Borrower also is permitted to *add* to Consolidated Net Income—and thus include in Consolidated EBITDA—specified categories of expenses or losses, so long as this is done "without duplication" and "to the extent deducted (and not added back) in determining Consolidated Net Income." In other words, the Borrower is expressly prohibited from double counting by adding back to Consolidated Net Income any expenses that did not decrease reported net income in the first place (such as reimbursed expenses).

42.     Among the items permitted to be added back to Consolidated Net Income under the Credit Agreement are "unusual or non-recurring and/or one-time costs, expenses or losses," as well as other defined categories of items that similarly are not considered recurring or the result of operational performance—for example, "'run rate' cost savings and synergies" from asset sales. Addbacks for these types of unusual items are capped at 20% of the Borrower's Consolidated EBITDA (before giving effect to these addbacks).

43.     Given the uncertainties surrounding the then-emerging COVID-19 pandemic and the effect it would have on Quorum, the lenders agreed that the Borrower also could add back to

Consolidated Net Income "any expenses or costs directly resulting from the Coronavirus Disease 2019 (COVID-19) (excluding, for the avoidance of doubt, any lost revenue or other pro-forma adjustments)." At the time this provision was being negotiated in early 2020, the COVID-19 pandemic was just taking hold in the United States. No one knew how long it would last, and many expected that its effects on healthcare companies would be short-lived. Hence, the lenders agreed that the Borrower's Consolidated EBITDA calculation could factor out costs and expenses directly resulting from COVID-19. The COVID-19 addbacks are not included in the cap of 20% of Consolidated EBITDA that applies to other unusual amounts.

44.     The choice of words for this addback was deliberate: the provision applies only to costs *directly* resulting from COVID-19. The Borrower is not entitled to add back any cost or expense that might be ultimately attributable to COVID-19, however loosely. This reflected the expectation held by many at the time, including analysts who followed the healthcare industry, that COVID-19 would have two principal direct effects on healthcare providers: *first*, lost revenue stemming from patients' decisions to defer or avoid visiting healthcare facilities for treatments and procedures; and *second*, expenditures on personal protective equipment for healthcare staff, such as facemasks, gloves, and plexiglass shields. As to the first set of expected losses, the definition of Consolidated EBITDA in the Credit Agreement expressly prohibits the Borrower from adding back lost revenues resulting from COVID-19. The addback for expenses "directly" resulting from COVID-19 therefore was designed to capture the second category: expenditures on a limited set of COVID-19-specific items like personal protective equipment.

45.     To allow the lenders to monitor compliance with the Credit Agreement, the Borrower is required to provide financial statements and a compliance certificate to the lenders 90 days after each year-end and 60 days after the end of each of the first three quarters of the

year. Among other things, these disclosures must include a detailed computation of the Secured

Net Leverage Ratio and a determination of whether the Borrower remains in compliance with its

maintenance covenant. The year-end certifications and accompanying statements also are

required to include, among other things, a detailed computation of excess cash flows.

46.    If the Applicable Percentage changes as a result of the Borrower's calculation of

the Secured Net Leverage Ratio in any period, the new Applicable Percentage becomes effective

beginning on the business day following delivery of the compliance certificate and financial

statements. For any time during which the Borrower has failed to honor its disclosure

obligations, the Secured Net Leverage Ratio is deemed to be in "Category 8" for purposes of

determining the Applicable Percentage—that is, the highest Applicable Percentage under the

Credit Agreement.

### C.    Events of Default and Default Interest

47.    Article VII of the Credit Agreement defines "Events of Default," the occurrence

of which allows the lenders to accelerate the loans and begin exercising secured-party remedies.

48.    Section 7.01 provides that an Event of Default occurs if any "certificate delivered

or required to be delivered [under the Credit Agreement] shall prove to be untrue in any material

respect on the date as of which it was made or deemed made." Delivery of a compliance

certificate that includes a materially untrue calculation of Consolidated Net Income,

Consolidated EBITDA, and the Secured Net Leverage Ratio therefore constitutes an Event of

Default.

49.    Section 7.01(c) provides that an Event of Default occurs if "default shall be made

in the payment of any interest on any Loan or any Fee or any other amount (other than

[principal]) due under any Loan Document, when and as the same shall become due and payable,

and such default shall continue unremedied for a period of five Business Days." Failing to pay

the full amount of interest owed on the loans when due, and allowing this failure to continue unremedied for five business days, therefore constitutes an Event of Default.

50.     Under section 2.07, during the continuance of an Event of Default, all overdue amounts accrue interest at an increased rate. For overdue interest, the rate of default interest is equal to the rate payable for ABR Loans plus 2.00% per annum.

### D.     Indemnification

51.     The Credit Agreement requires the Borrower to indemnify and reimburse the lenders and the Agent for all reasonable out-of-pocket expenses incurred in connection with the enforcement or protection of any lender's or agent's rights in connection with the Credit Agreement. That obligation includes the fees, charges, and disbursements of counsel in any litigation concerning the Credit Agreement.

52.     Specifically, section 9.05(a) of the Credit Agreement provides that "[Quorum] agrees to pay all reasonable out-of-pocket expenses . . . incurred by the Administrative Agent, the Collateral Agent or any Lender in connection with the enforcement or protection of its rights in connection with this Agreement and the other Loan Documents or in connection with the Loans made hereunder, including the fees, charges and disbursements of Milbank LLP, counsel for the Lenders and Paul Hastings LLP, counsel for the Administrative Agent and the Collateral Agent, and, in connection with any such enforcement or protection, the fees, charges and disbursements of one counsel in each relevant jurisdiction (and any such additional counsel, if necessary, as a result of actual or potential conflicts of interest) for the Administrative Agent, the Collateral Agent and the Lenders."

53.     In addition, section 9.05(b) provides that "[t]he Borrower agrees to indemnify the Administrative Agent, the Collateral Agent, each Lender and each Related Party of any of the

foregoing persons . . . against . . . any and all losses, claims, damages, liabilities, penalties and related reasonable out-of-pocket expenses, including reasonable fees, charges and disbursements of one counsel in each relevant jurisdiction (and any such additional counsel, if necessary, as a result of actual or potential conflicts of interest) . . . arising out of, in any way connected with, or as a result of . . .  the performance by the parties . . . of their respective obligations [under the Credit Agreement] or . . . any claim, litigation, investigation or proceeding relating to any of the foregoing."

### III.    QUORUM'S MATERIALLY UNTRUE COMPLIANCE CERTIFICATES

#### A.    The March 30 compliance certificate

54.    In connection with its reporting obligations under the Credit Agreement, the Borrower delivered compliance certificates for each of the first three quarters of 2021. These certificates reflected steady increases in the reported Secured Net Leverage Ratio, rising from 4.09 in the first quarter of 2021 to 4.56 in the second quarter, then jumping to 5.44 in the third quarter. At the same time, reported 12-month Consolidated EBITDA was deteriorating, falling from $194 million at March 31, 2021, to $152 million at June 30, 2021, to $136 million at September 30, 2021. These outcomes were consistent with Quorum's overall performance, which was declining from $239 million in reported net income for 2020 to a reported net loss of $117 million in 2021.

55.    These were clear signs of trouble for the Borrower. But rather than honestly calculating Consolidated Net Income, Consolidated EBITDA, and the Secured Net Leverage Ratio, the Borrower—on information and belief, at the behest of the equity holders—manipulated the calculations to avoid the requirement to pay a higher interest rate and a potential default of the maintenance covenant. On March 30, 2022, the Borrower delivered its financial

statements and compliance certificate for year-end 2021.[2] It reported a Consolidated EBITDA for the year of $160 million and a resulting year-end Secured Net Leverage Ratio of 4.16.

56.     The Borrower's calculation was materially untrue, and in violation of the Credit Agreement, for several reasons. *First*, the Borrower included some $50 million of government stimulus funds in Consolidated Net Income and, therefore, in Consolidated EBITDA. This was improper because the Credit Agreement requires that Consolidated Net Income exclude "extraordinary gains," and that Consolidated EBITDA exclude "non-recurring gains." The government stimulus funds received by the Borrower perfectly fit these descriptions. The CARES Act was enacted at the beginning of the COVID-19 pandemic to respond to an acute, once-in-a-century health crisis. Just as the pandemic is completely outside the ordinary, so too are the government grants that are designed to offset its effects. The Borrower's receipt of CARES Act funds will not go on forever. In fact, the Borrower stated in the notes to its audited December 31, 2021, financial statements that "there is no assurance regarding the extent of benefits which we may recognize or receive in the future under the CARES Act and related legislation or any future stimulus measures." It has reported decreasing income from government stimulus funds—$50 million in calendar 2021, down from $132 million in 2020—and indicated that it expected to record less than $8 million in stimulus funds in 2022. The CARES Act grants to the Borrower, by definition, are extraordinary and non-recurring and should have been excluded from both Consolidated Net Income and Consolidated EBITDA.

57.     *Second*, in calculating Consolidated EBITDA, the Borrower added back amounts it purportedly spent on COVID-19-related items, irrespective of whether it was reimbursed for those expenditures, such as from CARES Act funds. This resulted in double-counting and an

---

[2] A true and correct copy of the March 30 compliance certificate, with attachments, is attached as Exhibit B.

inaccurate picture of the company's performance. The Borrower treated reimbursed COVID-19

costs as "expenses," even though they were economically neutral to the company's net income; it

then added those amounts to Consolidated Net Income to turn them into pure gains. That makes

no financial, accounting, or logical sense. And it is inconsistent with the Credit Agreement,

which permits addbacks only if they are made "without duplication," and only if the purported

expenses were "deducted" from Consolidated Net Income in the first place.

58.     *Third*, in the March 30 compliance certificate, the Borrower announced that it was

adopting an entirely new approach to its COVID-19 addbacks, deviating from established

practice. The Borrower asserted that after "further review and consultation with the Company's

external legal counsel"—which, on information and belief, is the same counsel that represented

the now-equity owners (formerly the unsecured noteholders) in the 2020 bankruptcy case and

negotiations of the Credit Agreement—it had determined that its previous approach to COVID-

19 addbacks "applied concepts and mechanics inconsistent with the Credit Agreement." The

Borrower declared that it was materially expanding the kinds of costs it was adding back in the

calculation of Consolidated EBITDA. In total, the Borrower added back more than $59 million

of purported COVID-19 expenses in calculating Consolidated EBITDA for year-end 2021.

59.     The Borrower's newfound methodology for COVID-19 addbacks goes far beyond

the expenses and costs "*directly* resulting from" COVID-19. The Borrower now claims to be

able to add back costs that are, at most, indirectly attributable to COVID-19. The most egregious

example is a category of expenses the Borrower calls "Increase in Contract Labor Rate," which

constituted more than $12 million of the Borrower's COVID-19 addbacks for year-end 2021.

According to the Borrower's explanation in its March 30 compliance certificate, "[c]ontract

labor rates have increased materially during the pandemic due to the shortage of nursing staff,

nursing turnover and COVID infection of employed staff." The Borrower crudely compared how much it spent on contract labor in 2019 (plus a small adjustment for inflation) with how much it spent in 2021 and then added back the difference to Consolidated Net Income. In other words, the Borrower added back expenditures stemming from an overall nursing shortage and general inflationary forces in the labor market—which are affecting virtually every sector of the economy, may persist indefinitely, and are only indirectly (if at all) attributable to COVID-19. This is far afield from *direct* expenses that the parties intended to be included, like expenditures on personal protective equipment for workers.

60.     In its March 30 compliance certificate, the Borrower did not merely change its methodology for the quarter and year ended December 31, 2021. It also purported to change its reported figures for the first three quarters of 2021 retroactively. Nothing in the Credit Agreement permits the Borrower to revisit previous reporting and change numbers just because the company unilaterally decides to change approach—especially to a methodology that cannot be squared with the Credit Agreement's terms.

61.     The restated numbers demonstrate the magnitude of the effect of the Borrower's change in methodology. The Borrower originally reported "COVID non-reimbursed expenses" for the first quarter of 2021 of $5.6 million; but in the March 30 compliance certificate, the company revised the figure, based on its new methodology, to $20.1 million. For the second quarter of 2021, the figure jumped from $4.7 million to more than $10 million. And for the third quarter of 2021, the figure went from $5.6 million to more than $14 million. In short, the Borrower's new methodology allowed it to find nearly $30 million of additional COVID-19 expenses for the first three quarters of 2021 to add back to Consolidated Net Income, thereby

increasing Consolidated EBITDA and decreasing the resulting Secured Net Leverage Ratio for the year.

62.     The self-serving nature of the new methodology is made plain by the fact that the Borrower, as it disclosed in its March 30 compliance certificate, has "cost centers" that are "set up to track costs incurred as a result of treating COVID patients but are not eligible for insurance reimbursement." But expenses tracked by those cost centers constitute just one of seven categories of COVID-19 expenses that the Borrower included in its addbacks under the new methodology, and they made up only about $25 million of the $59 million of the total amount of COVID-19 addbacks for 2021. To inflate its COVID-19 addbacks, the Borrower apparently re-allocated expenses that were not tracked in its specialized COVID-19 cost centers. And in the company's year-end report, even those expenses tracked by COVID-19 cost centers were materially higher for each quarter of 2021 than was reported in the quarterly disclosures Quorum previously provided.

63.     It is likewise significant that in previous periods, the Borrower used the term "non-reimbursed" to describe the COVID-19-related expenses it was adding back. It is clear now that the Borrower has sought to add back even reimbursed expenses, resulting in the double counting described above.

64.     The Borrower's manipulations also attempt impermissible end-runs around other carefully negotiated limitations on addbacks in the Credit Agreement. As described above, in calculating Consolidated EBITDA, "unusual or non-recurring" or "one-time" costs can be added back, as well as "'run rate' cost savings and synergies"—but subject to a cap of 20% of Consolidated EBITDA. In wrongfully including government stimulus funds to inflate Consolidated Net Income and Consolidated EBITDA, the Borrower also inflated the 20%

capacity it has for these other addbacks. Plus, under its new methodology, the Borrower is claiming the right to classify more expenses as COVID-19-related than it did before, thus improperly exploiting the fact that the 20% cap on addbacks for unusual expenses does not apply to COVID-19 expenses.

65.     On April 4, 2022, Quorum issued an interest rate notice[3] claiming that the Applicable Percentage from March 31 forward was in category 1, the lowest spread contemplated by the Credit Agreement. Quorum thus accrued interest on the Eurodollar loans from March 31 until the delivery of the next period's compliance certificate at a rate corresponding to a purported Secured Net Leverage Ratio of 4.16.

### B.     The May 23 compliance certificate

66.     In response to the false March 30 compliance certificate, a group of lenders sent Quorum a letter on April 6, 2022, expressing their belief that the certificate did not comply with the requirements of the Credit Agreement and that the Consolidated EBITDA and Secured Net Leverage Ratio calculations were untrue and materially misstated. The letter urged Quorum to provide a corrected compliance certificate and to adjust the April 4 interest notice accordingly.

67.     But the Borrower doubled down. In a letter from the same law firm that represented the current equity owners (the former noteholders) in the bankruptcy and the negotiations of the Credit Agreement, the Borrower responded on April 8, 2022, "categorically den[ying]" the assertion that the March 30 compliance certificate violates the Credit Agreement and rejecting outright the contention that the leverage ratio was miscalculated. And it dug in its heels on the COVID-19 addbacks, insisting that they are compliant with the Credit Agreement.

---

[3] A true and correct copy of the April 4 interest notice is attached as Exhibit C.

68.     On May 23, 2022, the Borrower delivered to the lenders its financials and compliance certificate for the first quarter of 2022.[4] Management conceded that the results for the first quarter of 2022 were "disappointing." That was an understatement. Whereas the company reported "Adjusted EBITDA" of more than $25 million for the three months ended December 31, 2021, it reported an "Adjusted EBITDA" of barely more than $3 million for the three months ended March 31, 2022. And whereas the March 30 compliance certificate reported a Secured Net Leverage Ratio of 4.16 for the end of 2021 (a number the Borrower claimed to revise in the May 23 compliance certificate to a reported figure of 4.08), the May 23 compliance certificate reported that the Secured Net Leverage Ratio had skyrocketed to 5.40 for the first quarter of 2022—even when calculated, on information and belief, using the same impermissible methods.

69.     Moreover, in the financial statements for the first quarter of 2022, Quorum recognized that the maximum Secured Net Leverage Ratio permitted under the Credit Agreement was slated to step down over the course of the year, and that "due to continued losses, lower than expected volumes, and early second quarter 2022 results indicating performance below our 2022 targets and the future reduction of the maximum Secured Net Leverage Ratio, substantial doubt about the Company's ability to continue as a going concern exists." The financials went on to report that the company would seek covenant relief from the lenders to stay afloat.

70.     While the May 23 compliance certificate revealed serious ongoing issues with the Borrower's financial condition and reported a much-increased leverage ratio, it evidently did not correct the issues that plagued the March 30 compliance certificate. Instead, on information and belief, Quorum perpetuated the problems: it continued to include government stimulus funds in

---

[4] A true and correct copy of the May 23 compliance certificate, with attachments, is attached as Exhibit D.

its Consolidated Net Income, to add back COVID-19 expenses for which it was reimbursed, and to include in its COVID-19 addbacks many expenses that were not "directly" related to COVID-19. The Borrower made no representation that it had altered its methodology, despite being aware of the lenders' view that its methodology is inappropriate. To the contrary, the Borrower acknowledged in its May 23 financial statements that it had received the lenders' letter of April 6, 2022, challenging the truthfulness of the March 30 compliance certificate, but the Borrower went on to assert that it believed that compliance certificate was "completed appropriately."

71.    The May 23 compliance certificate, on information and belief, also did not comply with the Credit Agreement and wrongfully understated the Secured Net Leverage Ratio and overstated Consolidated Net Income and Consolidated EBITDA. The Borrower's reported Secured Net Leverage Ratio of 5.40 placed it in Category 6 for the Applicable Percentage; but this was still below the highest interest rate contemplated by the Credit Agreement.

72.    If anything, the May 23 compliance certificate laid bare the extent to which the company's methodology has been giving a distorted picture of its financial condition and masking its distress. Quorum's steep drop-off in performance (and increase in reported leverage) between the March 30 and the May 23 compliance certificates coincided with the drying up of stimulus money. Quorum reported that it received only about $7.3 million in government stimulus funds during the first quarter 2022, compared with more than $26.4 million in the immediately preceding quarter. Without massive amounts of money from the government's one-off stimulus program, Quorum could not inflate its Consolidated Net Income and Consolidated EBITDA, and deflate the Secured Net Leverage Ratio, to the same degree as before.

73.     On May 24, 2022, the Borrower issued a new interest rate notice,[5] stating that interest would accrue, until delivery of the next period's compliance certificate, at a rate corresponding to Category 6 for the Applicable Percentage. That rate results from a Secured Net Leverage Ratio of 5.40, as reported in the May 23 compliance certificate.

## IV.     HARM TO LENDERS

74.     The effects of the Borrower's manipulations are stark. In the March 30 compliance certificate, the Borrower inappropriately included in Consolidated Net Income about $50 million in government stimulus funds. On top of that, the Borrower then further added $59 million of COVID-19 expenses in calculating Consolidated EBITDA, including those that are (at best) only indirectly traceable to COVID-19. These adjustments together more than *tripled* the Borrower's earnings for purposes of calculating Consolidated EBITDA and the Secured Net Leverage Ratio.

75.     The harm to the lenders from these manipulations in the March 30 compliance certificate already has occurred. The Borrower's April 4 interest rate notice wrongfully relied on the Borrower's falsely deflated Secured Net Leverage Ratio and represented that interest for the period starting March 31, 2022, would be paid at the lowest rate (i.e., Category 1, reflecting a Secured Net Leverage Ratio below 4.25).

76.     On April 7, 2022, the Borrower made an interest payment that was based, in part, on its materially untrue calculations. For the period from January 7 to March 30, 2022, the Borrower calculated interest at a rate of 8.75% (a base rate of 1% and a margin of 7.75%) for its Eurodollar loans. That corresponded to Applicable Percentage Category 6 and a Secured Net Leverage Ratio of 5.44, as the Borrower reported in its third-quarter compliance certificate. But

---

[5] A true and correct copy of the May 24 interest notice is attached as Exhibit E.

for the period from March 31 to April 6, 2022, the Borrower calculated interest at a rate of 7.50% (a base rate of 1% and a margin of 6.50%), corresponding to Applicable Percentage Category 1 and the inaccurate Secured Net Leverage Ratio of 4.16 reported in the March 30 compliance certificate. Since the Borrower wrongly calculated its Secured Net Leverage Ratio, it also wrongly determined the Applicable Margin to take effect the day following delivery of the March 30 compliance certificate. As a result, its April 7 interest payment (calculated at the lowest rate for the period from March 31, 2022, to April 6, 2022) was less than what was required under the Credit Agreement. The Borrower's failure to pay the full amount of interest owed for more than five business days after it was due and payable constitutes an Event of Default under the Credit Agreement.

77.     The harm to the lenders did not end there. The Borrower purported to be accruing interest at that same incorrect rate through the date of delivery of its May 23 compliance certificate. Then, in the May 23 compliance certificate, the Borrower perpetuated the problem. It reported a Secured Net Leverage Ratio of 5.40; but on information and belief, the Borrower arrived at this figure using the same impermissible techniques as it deployed in the March 30 compliance certificate to decrease the leverage ratio and the resulting interest rate. The next day, the Borrower delivered another interest rate notice stating that it was accruing interest at a rate corresponding to the Secured Net Leverage Ratio it reported in the May 23 compliance certificate.

78.     There is no indication that the Borrower will stop there. For so long as the Borrower fails to correct its calculations of the Secured Net Leverage Ratio, its interest deficit will continue to grow and the lenders will not receive the full amounts that they are owed.

79.     Furthermore, the Credit Agreement provides that for any time during which the Borrower has failed to deliver the required compliance certificates, the Secured Net Leverage Ratio is deemed to be in Category 8 for purposes of determining the Applicable Percentage for interest payments. Because the Borrower has continued to fail to issue true and correct compliance certificates—instead relying on incorrect calculations of Secured Net Leverage— interest should have accrued at the Category 8 level since at least March 31, 2022, and should continue to accrue at that rate until the Borrower is in compliance with the Credit Agreement.

80.     More than just the interest rate is at stake, however, since several other provisions in the Credit Agreement are tied to the Borrower's Consolidated Net Income, Consolidated EBITDA, and Secured Net Leverage Ratio. This includes the maintenance covenant in section 6.13. While the Borrower's performance has continued to deteriorate—it suffered a net loss of more than $116 million in 2021 and of $55 million for the first quarter of 2022 alone—the maximum Secured Net Leverage Ratio permitted under the maintenance covenant is scheduled to decrease every quarter until March 31, 2023, at which point the ceiling will be 5.00 for the remainder of the term of the loans. The Borrower's improper calculations, which artificially depress the Secured Net Leverage Ratio, give the false appearance that the Borrower has more leeway under that covenant than it really does. An artificially low Secured Net Leverage Ratio likewise gives the equity holders more time, and more room for the Borrower's performance to decline, before they have to make a new equity infusion to cure any non-compliance with the maintenance covenant. The improper calculations therefore serve to protect the equity owners by delaying their need to come out of pocket further, and by hindering an exercise of remedies by the secured lenders that might dispossess the equity holders of Quorum entirely.

81.     The risk that the Borrower already has exceeded its leverage ratio ceiling, or soon will, is real and concrete. On information and belief, if the Borrower's improper inclusion of government stimulus funds in its COVID-19 addbacks in the May 23 compliance certificate were reversed, the Borrower already would be in default of its maintenance covenant. Bolstering this point, the Borrower's May 23 financial disclosures conceded that there is "substantial doubt" about the Borrower's ability to comply with its maintenance covenant and to continue as a going concern throughout 2022, as the leverage ceiling steps down. And even that concession was premised on the company's artificially deflated Secured Net Leverage Ratio. The "doubt" will be only more "substantial" when the Borrower's impermissible methodology is corrected and the Secured Net Leverage Ratio rises accordingly.

82.     The Borrower's manipulations also implicate the Credit Agreement provisions restricting the Borrower's use of property and other conduct if its financial condition deteriorates. Quorum has disclosed to lenders that it received a non-binding letter of intent to sell several hospitals for a combined $25 million to $30 million. The Credit Agreement requires the Borrower to use asset sale proceeds to prepay the loans if the Secured Net Leverage Ratio is over 4.75. Similarly, when the Secured Net Leverage Ratio exceeds 5.00, the Borrower must use 75% of any excess cash flows to prepay the loans, but that percentage decreases with lower leverage levels. Although the May 23 compliance certificate reported a Secured Net Leverage Ratio of 5.40, such that the entirety of any asset sale proceeds and 75% of any excess cash flows must be used to prepay the loans, it is imperative that the Borrower's methodology be corrected now so that the lenders know in future periods that the Borrower will abide by the Credit Agreement, report a correctly determined leverage ratio, and not improperly divert asset sale proceeds or excess cash flows that must be used to reduce the loan balance. Likewise, the lenders require

comfort that the Borrower will not rely on improper calculations when deciding to pay dividends or make investments outside the lenders' credit group, incur additional indebtedness, or increase the loan balance under the Credit Agreement—all of which are limited depending on the Borrower's Consolidated EBITDA or Secured Net Leverage Ratio.

## FIRST CAUSE OF ACTION
### (DECLARATORY JUDGMENT)

83.     Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

84.     This action presents an actual controversy within the Court's jurisdiction, so the Court may declare the rights and other legal relations of the parties in accordance with 28 U.S.C. § 2201(a).

85.     The dispute between Plaintiff and the Borrower is definite and concrete.

86.     The dispute concerns adverse legal interests espoused by the Plaintiff and the Borrower.

87.     A declaratory judgment will resolve the legal issues involved by finalizing the controversy and offering relief from uncertainty.

88.      The lenders have informed Quorum that the Consolidated EBITDA and leverage ratio calculations in the March 30 compliance certificate are incorrect, rendering that certificate materially untrue; that the methodology used to conduct those calculations was not consistent with the Credit Agreement; and that Quorum's computation of interest in its April 4 notice, made in reliance on the March 30 calculations, was incorrect. Quorum has rejected these positions and asserted that its reported computations are correct and that its methodology complied with the Credit Agreement. Quorum has further stated that it believes its April 4 interest notice was correct and, on April 7, it paid interest in an amount that was based on that notice. Quorum has refused to provide a corrected compliance certificate or corrected interest notice. On information

and belief, Quorum used the same impermissible calculation methods in its May 23 compliance certificate as it used in the March 30 compliance certificate, and it relied on an improperly calculated Secured Net Leverage Ratio in determining the Applicable Percentage in its May 24 interest rate notice.

89.     Quorum's conduct already has caused injury to the lenders: its April 7 payment of interest was in the wrong amount because Quorum relied on its improper calculation of Secured Net Leverage Ratio to set the Applicable Percentage for the period beginning March 31. Because Quorum failed to comply with the requirements of section 5.04 of the Credit Agreement, the Secured Net Leverage Ratio was "deemed to be Category 8 for purposes of determining the Applicable Percentage" for the entire period that this failure of disclosure goes unremedied.

90.     Harm to the lenders will increase if Quorum's conduct remains unchanged and unremedied, as described above.

91.     Accordingly, and by reason of the foregoing, Plaintiff seeks a declaratory judgment that:

(a) Quorum's March 30 and May 23 compliance certificates (including the attached financial statements and supplemental disclosures) were materially untrue, and the methodology used to determine Consolidated Net Income, Consolidated EBITDA, and the Secured Net Leverage Ratio did not comply with the Credit Agreement;

(b) Quorum's delivery of materially untrue compliance certificates constituted an Event of Default under the Credit Agreement;

(c) Quorum's April 4 and May 24 interest notices computed the wrong rate of interest, and Quorum's payment of interest on April 7 was less than what was required to be paid

according to a proper calculation of the Secured Net Leverage Ratio and had Quorum timely complied with its disclosure obligations under section 5.04;

(d) Quorum's failure to pay the full amount of interest owed on April 7, which was not cured within five business days (and still has not been cured), constituted an Event of Default under the Credit Agreement; and

(e) Quorum must restate the March 30 and May 23 compliance certificates (and attached financial statements and supplemental disclosures) and its April 4 and May 24 interest notices, and it must adopt a methodology for those and future certificates and interest notices that complies with the Credit Agreement.

## SECOND CAUSE OF ACTION
### (BREACH OF CONTRACT – FAILURE TO PAY INTEREST)

92.     Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

93.     Plaintiff and Quorum are parties to the Credit Agreement.

94.     The Credit Agreement is a valid contract.

95.     Plaintiff has performed its obligations under the Credit Agreement.

96.     The lenders have performed their obligations under the Credit Agreement.

97.     Quorum violated the Credit Agreement by failing to pay the full amount of interest due on April 7, 2022.

98.     The lenders have been damaged as a result of Quorum's underpayment of interest.

99.     Accordingly, and by reason of the foregoing, Plaintiff is entitled to an award of damages sufficient to remedy Quorum's underpayment of interest on April 7, 2022, inclusive of default interest owed under section 2.07 of the Credit Agreement.

## THIRD CAUSE OF ACTION
### (INDEMNITY)

100.    Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

101.    Section 9.05(a) requires Quorum to pay all reasonable out-of-pocket expenses incurred by the Administrative Agent, the Collateral Agent, or any Lender in connection with the enforcement or protection of its rights in connection with this Agreement. This action was brought to enforce and protect the rights of the Administrative Agent, Collateral Agent, and the lenders under and in connection with the Credit Agreement and the Loans made thereunder.

102.    Section 9.05(b) of the Credit Agreement requires the Borrower to indemnify the Administrative Agent, the Collateral Agent, and any lender against any and all losses arising out of any litigation or claim relating to the Borrower's performance of its obligations under the Credit Agreement. This action relates to the Borrower's performance (in reality, non-performance) of its obligations under the Credit Agreement.

103.    Plaintiff has brought this suit at the direction of lenders holding more than 50% of outstanding loans to enforce the Credit Agreement, constituting the Required Lenders sufficient to direct the Agent to take certain actions, including filing this suit.

104.    Accordingly, and by reason of the foregoing, Quorum is required to pay the out-of-pocket expenses incurred by the Administrative Agent, the Collateral Agent, and any lender, including attorneys' fees, in connection with this action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for the following relief:

(i)     A declaratory judgment providing that: (a) Quorum's March 30 and May 23 compliance certificates (including the attached financial statements and

supplemental disclosures) were materially untrue, and the methodology used to determine Consolidated Net Income, Consolidated EBITDA, and the Secured Net Leverage Ratio do not comply with the Credit Agreement; (b) Quorum's delivery of materially untrue compliance certificates constitutes an Event of Default under the Credit Agreement; (c) Quorum's April 4 and May 24 interest notices computed the wrong rate of interest, and Quorum's payment of interest on April 7 was less than what was required to be paid according to a proper calculation of the Secured Net Leverage Ratio and had Quorum timely complied with its disclosure obligations under section 5.04; (d) Quorum's failure to pay the full amount of interest owed on April 7, which has not been cured, constitutes an Event of Default under the Credit Agreement; and (e) Quorum must restate the March 30 and May 23 compliance certificates (and attached financial statements and supplemental disclosures) and its April 4 and May 24 interest notices, and it must adopt a methodology for those and future certificates and interest notices that complies with the Credit Agreement;

(ii)     An order requiring Quorum to pay damages sufficient to remedy Quorum's underpayment of interest on April 7, 2022, inclusive of default interest under section 2.07 of the Credit Agreement;

(iii)    An order requiring Quorum to pay the out-of-pocket expenses incurred by the Administrative Agent, the Collateral Agent, and any lender, including attorneys' fees, in connection with this action;

(iv)     An order awarding Plaintiff and the lenders interest, reasonable attorneys'

fees, and costs available under the law; and

(v)      Such other and further relief as this Court deems just and proper.


Dated: June 7, 2022
         New York, New York

                                        Respectfully submitted,

                                        By: /s/ Andrew M. Leblanc
                                        Dennis F. Dunne, Esq.
                                        Tyson M. Lomazow, Esq.
                                        Alexander B. Lees, Esq.
                                        Kim B. Goldberg, Esq.
                                        **MILBANK LLP**
                                        55 Hudson Yards
                                        New York, New York 10001
                                        Telephone: (212) 530-5000
                                        Facsimile: (212) 530-5219

                                        Andrew M. Leblanc, Esq.
                                        **MILBANK LLP**
                                        1850 K Street NW, Suite 1100
                                        Washington, D.C. 20006
                                        Telephone: (202) 835-7500
                                        Facsimile: (202) 263-7586


                                        *Counsel to UMB Bank, N.A.*